## UTILITY COAL CO. v. ROGEZ.

No. 25207.   Dec. 18, 1934.

Rehearing Denied Jan. 14, 1935.

Geo. S. Ramsey, C. J. Pinkston, Villard Martin, and Garrett Logan, for petitioner.

Anton Koch, for respondent.

BAYLESS, J.   This is an original action to review an award of the Industrial Commission in favor of Oscar Rogez, Joe Ferrero, and J. L. Clark against Gene Taylor, Ellis R. Taylor, Jr., and Ellis R. Taylor, Sr., individually. The first case tried was that of Joe Ferrero, and it was agreed by and between all of the parties that the testimony taken in the Ferrero case would be the testimony in the case of J. L. Clark and in the case of Oscar Rogez, and by order of the Commission all three cases were consolidated for the purpose of trial.

The extent of the injuries and amount of compensation awarded the claimants are not in question.

The record discloses that the Taylor family, consisting of Gene Taylor, Ellis R. Taylor, Jr., and Ellis R. Taylor, Sr., for the past six years owned and operated a coal mine, consisting of the mineral rights and all machinery necessary to operate a coal mine, near Henryetta, Okmulgee county, Okla., and have organized what is known as the Ben Hur Coal Company, a corporation, and the Utility Coal Company, a corporation, with all the stock owned by the Taylor family; and that said corporations were operating what is known as the Sun mine, Ellis R. Taylor, Sr., being the president of both companies and Ellis R. Taylor, Jr., the secretary. They operated said mine until January 1, 1933, when the coal business ceased to be a profitable business, at which time they closed down the mine. The Taylor family then decided to organize a copartnership, and they retained, under the alleged partnership agreement, the full management. The alleged articles of copartnership were drawn and prepared by the attorneys for the Taylor family and the companies which they represented. The alleged partnership agreement was submitted to and signed by some hundred or more persons who were previously employed by the Ben Hur and Utility Coal Companies. The record further discloses that only those who signed the alleged agreement were permitted to work in the mine; that

the workmen understood when they signed the agreement that in case of injury while working in the mine, they (the workmen) would bear their own medical expenses and would not recover compensation by reason of any accidental personal injuries; that the workmen were to share in the net profit of the mine according to the scale of wages in force and effect at the Sun mine before this agreement was entered into; that the workmen, sharing in the net profits from the mining operation, received on an average of $4.50 per day under the agreement, which was a substantial increase in earning over what they received while working for the Ben Hur and Utility Companies.

The Commission, after having heard all of the evidence introduced, found:

"1. That on and prior to August 28, 1932, Gene Taylor, Ellis R. Taylor, Jr., and Ellis R. Taylor, Sr., or R. E. Taylor, and up to and after the hearing and trial of this cause, were and are the owners of the right to mine and take coal from under certain lands in Okmulgee county, Okla., and are and were the owners of certain tools, machinery, fixtures and apparatus, and livestock consisting of general equipment for operating and taking coal from under said lands and were operating by and under the several names of Utility Coal Company, a corporation, Sun Mines, Utility Co-operative Association, a partnership, and Ben Hur, and all of which constituted a resulting copartnership in the operating and mining and taking of coal from under said land.

"2. That while so operating under the name of Utility Co-operative Association, on August 28, 1932, the claimant, while employed by them and engaged in a hazardous employment as defined by the Workmen's Compensation Law of Oklahoma, and arising out of and in the course of his employment, sustained a personal accidental injury, when he was helping driver lift on a loaded car of coal and received a hernia and back injuries."

To these findings the petitioners assign four propositions of error.

The first and second assignments of error being identical, except that they refer to different parties, will be disposed of as one proposition. The petitioners contend that there is no evidence in the record that claimant was an employee of the Ben Hur Coal Company or the Utility Coal Company, and the award against both companies should be vacated. Though there may be some question as to whether the Commission in its findings intended to enter an award against the Ben Hur and Utility Companies, a dis-

cussion of this assignment of error is unnecessary, since claimants concede that the Commission did not enter the award against Ben Hur and Utility Coal Companies, but only entered the award against Gene Taylor, Ellis R. Taylor, Jr., and Ellis R. Taylor, Sr., as individuals.

Petitioners in their third assignment of error contend:

"That the award against respondents, members of the Utilities Co-operation, should be vacated for the reason that claimant was a member of the partnership, received no wages irrespective of profits, and is not an employee of the partnership."

In support of this contention petitioners quote the testimony of the witnesses to the effect that the agreement entered into between the parties herein constituted a partnership. The claimant contends that the agreement created the relationship of employer and employee.

In determining the relationship created, we deem it necessary to set out herein certain parts of the agreement, which are as follows:

"1. This contract and agreement, executed this 2nd day of February, A. D. 1932, by and between Utility Coal Company, a Delaware corporation, party of the first part, and R. E. Taylor, Ned Wilson, Gene Taylor, and other such persons as may hereafter agree to the terms hereof, and whose names, upon participation herein, shall be signed and appear at the end hereof in the space provided therefor, designated as second parties, all of whom shall hereinafter be referred to as parties of the second part, said association to be known as Utility Co-operative Association.

"* * * 2. Said second parties, and each of them, including any person who shall hereinafter become a participant herein as second party, as hereinabove referred to, hereby associate themselves together as co-operative coal mining, producing and selling association, for the purpose of producing, mining and selling coal, and do hereby agree to the following terms and conditions of said association and its policy of operation and management.

"3. That the remuneration to be derived by the co-operators from their joint venture shall, as to the machine men, loaders, drivers, day men, both underground and top men, be based upon the scale of wages in effect at what is known as the Sun mine on July 1, 1931; that the remuneration of the manager of said association shall be based upon a wage of $6 per day; that the remuneration of superintendent of said association shall be based upon the sum of $6 per day; that the

remuneration and wages of the pit boss of said association shall be based upon the sum of $6 per day. Provided, however, that it is specifically understood and agreed by and between the second parties hereto that if the earnings of said association shall fail to be sufficient to pay the remuneration above specified, that then, and in that event, each of the said second parties shall only receive his proportionate share of the net earnings or said association as his rate of pay or of wages, as hereinabove specified, shall bear to the entire net amount of earnings of said association, and, provided further, that for the purpose of computing wages and the total amount of remuneration due each of the parties of the second part, the actual net earnings of the association on hand and unexpended and unpledged at the time of the computing of the payroll, shall be the sum on which such payroll is computed.

"* * * 4. It is further agreed by and between the party of the first part and the parties of the second part that notwithstanding this agreement is made to continue for the space of twelve (12) months from and after the date of its execution, that the same may be canceled and set aside by either party upon five days' notice of its intention to do so, without assigning reason therefor whatsoever, and in the event that either the first party or the second parties shall decide to exercise its or their right to cancel said agreement prior to the expiration of the twelve months' period, that neither shall have an action at law of any kind or character whatsoever by reason of said cancellation of said agreement.

"* * * 5. It is further understood by and between the second parties hereto, and each of them, that during the period of this agreement R. E. Taylor shall be the manager of said company, Ned Wilson shall be and act as the pit boss, and Gene Taylor shall occupy the position of superintendent of said association; however, if for good and sufficient reason, by a three-fourths vote of the total number of the parties of the second part they signify their desire to remove any or all of said officers, they may do so, and in such event employ such other persons to fill such positions, as they may by a three-fourths vote of said members of the association designate. A meeting of the second parties may be had at any time by giving such notice therefor as is specified for special meetings of a domestic corporation by the statutes of the state of Oklahoma.

"6. It is further specifically agreed by and between the parties of the second part, each of them, that the manager, superintendent and pit boss, as hereinabove named, or shall be hereafter named, shall have the exclusive right to terminate this agreement, as to any member of said association at any time they or either of them deem such termination to be for the best interests of said association, and their action in so doing shall not be subject to revision or cancellation or question by the member or members so eliminated, or by said association in any event. Upon the termination of any member's relationship to and with the company, as aforesaid, it shall be the duty of said association to immediately compare the amount of money due said member, if any, and to immediately discharge such obligation to him by payment in full, which shall be and constitute an effectual and final termination of the mutual obligations by said association and such outgoing member. Any addition of membership to this association shall only be with the approval of the manager, superintendent and pit boss of the association.

"7. Dividends shall be declared semi-annually by the manager, superintendent and pit boss, or more often if they deem advisable, provided that money be accumulated with which to pay the dividends. Ellis Taylor is hereby appointed and designated to be the sales agent for the coal produced by this association, and he shall also keep the books of and render semi-monthly statements to said association. * * *"

(The numbering of these quoted parts of the contract is an arbitrary system adopted by the court for the purpose of identification in this opinion.)

Much importance is attached by petitioners to the fact that claimant received no "wages"; his sole right to remuneration was through the profits of the business, if any. That if there were no profits earned by the operations, the members of the association received no money. Authorities are cited by petitioners which support the contention that a member of a partnership is not entitled to compensation under our law. However, a mere community of interest as owners of specific property or of the profits from a particular adventure or business, does not necessarily, of itself, constitute the co-owners partners. See Chadwell et ux. v. Brown et al., 88 Okla. 44, 211 P. 410. The sharing of profits and losses is only one factor in determining whether or not a partnership exists. In Morris v. Savage, 126 Okla. 221, 259 P. 239, we said:

"In order to constitute a partnership inter sese there must be: (1) An intent to form the same; (2) generally a participating in both profits and losses; (3) and such a community interest, as far as third persons are concerned, as enables each party to make contracts, manage the business, and dispose of the property; where the agreement does not contain these essential elements, it does not constitute a partnership."

From an examination of parts numbered 5, 6 and 7 above, it can be seen that a dis-

proportionate share of the management and operation of this organization is vested in R. E. Taylor, Ned Wilson, and Gene Taylor, in this, to wit, in part No. 5, these men are given certain positions which can only be taken from them by a three-fourths vote of the other parties to the agreement, and then only after notice of a meeting to be held for that purpose. Said notice to be given in accordance with the statutes of the state of Oklahoma governing notice of special meetings of domestic corporations. It can be seen, however, from paragraph No. 6 that either of these three men may terminate the connection with the organization of any of the other members thereof at any time, without reason and without liability for the wrongful exercise of this power. It is no strain upon the language of this agreement to say that any time a meeting was called for the purpose of submitting to a vote whether or not the officers might be removed from the position given them, the officers could anticipate the action of those calling the meeting and circumvent it by immediately terminating the agreement as to them.

By reading paragraph 7 it can be seen that the distribution of the money, called dividends in this agreement, is also vested in these men. These powers certainly are not less than the powers possessed and exercised by these three men before the signing of the agreement for the purpose of creating the new organization, and in our judgment are in every respect equal thereto.

In our opinion the portions of the agreement above set out negative the existence of a partnership. Certainly the agreement creates a difference in standing of the workmen and the officers, and takes away from the workmen any right of management; does not permit them to make any contracts which would bind the association as partners, with no right to reject or approve those who should thereafter become members of the association, and the manager, superintendent, and pit boss had the exclusive right to discharge the workmen at any time the officers deemed it best for the interests of said association, with no right to question the action of the officers in so doing. In view of what we said in Morris v. Savage, supra, we think the agreement in this case falls short of creating a partnership.

In Schneider's Workmen's Compensation Law, vol. 1 (2d Ed.) p. 161, we find the correct test for determining whether a person is an employer of another, which is as follows: ·

"* * * It has been held that the test by which to determine whether a person is an employer of another is to ascertain whether, at the time the injury was suffered, the other was subject to such person's orders and control and was liable to be discharged for disobedience of orders or misconduct."

Further, in our Statutes, section 13371, O. S. 1931, it is said:

"No agreement by an employee to waive his right to compensation under this act shall be valid."

Under the facts and circumstances in this case, we are of the opinion that the relationship created by the agreement was that of employer and employee.

The award of the Commission is affirmed.

RILEY, C. J., and SWINDALL, ANDREWS, McNEILL, and OSBORN, JJ., concur. CULLISON, V. C. J., and BUSBY and WELCH, JJ., absent.